# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JOSEPH LUNDSTROM and
JANE HIBNER,

               Plaintiffs,

vs.                                                CIV No. 07-759 JCH/WDS

ALBUQUERQUE POLICE OFFICERS
DEBRA ROMERO, ANTHONY SEDLER,
LORENZO APODACA, EDOUARD TAYLOR,
and OFFICER ZAZZA GREEN, in their individual
Capacities and as employees of the City of Albuquerque,

               Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment Requesting Dismissal of Plaintiff Joseph Lundstrom's Claims, filed April 1, 2008 [Doc. 72], Defendants' Motion for Summary Judgment Requesting Dismissal of Plaintiff Jane Hibner's Claims, filed April 9, 2008 [Doc. 76], and Plaintiffs' Motion for Summary Judgment, filed May 29, 2008 [Doc. 104]. Having reviewed the pleadings, memoranda, exhibits of record, and relevant law, and otherwise being fully advised in the premises, the Court concludes that Defendants are entitled to summary judgment with respect to Plaintiffs' claims arising from encounters with Officer Romero and from the seizure of their persons. The Court further concludes that Defendants are entitled to summary judgment with respect to Plaintiffs' claims arising from officers' entry into Plaintiff Lundstrom's home and entry into his backyard. However, with respect to Plaintiffs' claim that the search of Plaintiff Lundstrom's house exceeded the proper scope, the Court concludes that Officers Romero and Taylor are entitled to summary judgment based on their lack of personal participation but that the remaining Defendants and Plaintiffs are not entitled to summary judgment.

Accordingly, Defendants' Motion for Summary Judgment Requesting Dismissal of Plaintiff Joseph Lundstrom's Claims is **GRANTED IN PART** and **DENIED IN PART** as more fully described herein.  Defendants' Motion for Summary Judgment Requesting Dismissal of Jane Hibner's Claims is **GRANTED**, and Plaintiffs' Motion for Summary Judgment is **DENIED**.

## I. BACKGROUND

Plaintiffs' Third Amended Complaint, filed March 4, 2008, alleges that on the night of August 19, 2006, Defendants subjected Plaintiff Joseph Lundstrom (hereinafter "Lundstrom") to an unreasonable seizure, an excessive use of force, an unlawful search of his home, assault, battery, trespass, false arrest, and false imprisonment.  With regard to Plaintiff Jane Hibner (hereinafter "Hibner"), the Complaint alleges that she was subjected to an unlawful seizure, false arrest, and false imprisonment by Defendants, also on August 19, 2006. Additionally, Plaintiffs have filed a motion for summary judgment, arguing that they are entitled to summary judgment with regard to each of their claims.

 From the parties' cross-motions for summary judgment and the evidence before the Court, it is possible to glean the following undisputed facts.[1]  During the evening of August 19, 2006, an individual by the name of Beth Mohr called 911 and reported that "the people across the alley from me are like beating their toddler, and they've got him outside in the rain and she's screaming at him that he can come in the house when he shuts the f*** up."  Although Mohr admitted that she did not actually see anyone hit the child, she told the dispatcher that she could

---

[1] For the purpose of Defendants' motions for summary judgment, the Court looks to the evidence before it in the light most favorable to the Plaintiff, even with regard to Defendants' assertions of qualified immunity.  *See Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).  Conversely, for the purpose of Plaintiffs' motion for summary Judgment, the Court looks to the evidence in the light most favorable to the Defendant.  *Kaus v. Standard Ins. Co.*, 985 F. Supp. 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998).

"hear them smacking him" and that he was screaming.  Mohr estimated from the child's voice that he was a toddler or younger.  According to Mohr, the child was located at 5100 Mountain.  She informed the dispatcher that she had driven down the alley in an attempt to check on the child, but was unable to see anything.  Mohr left her phone number with the 911 dispatcher.

At approximately 9:30 p.m. that same night, Officer Debra Romero responded to 5100 Mountain in order to check on the child's welfare.  Upon arriving at the residence, Officer Romero heard a high-pitched noise and was unable to discern whether it was a child or an adult who made the noise.  She rang the doorbell and Lundstrum answered the door.  At that time, Hibner, Lundstrom's girlfriend, was inside on the telephone.

Initially, Officer Romero was standing to the side of the home's entrance, shining her flashlight in the window.  Once Lundstrum answered the door, however, she shined her flashlight in his direction.  Officer Romero was in full uniform and identified herself as an Albuquerque Police Officer.  She explained to Lundstrom that she was there to check on the welfare of a child.  Lundstrom told her that there was no child present in his home.  Officer Romero insisted that she needed to verify that no child was in need of assistance.  Lundstrom demanded identification.  Officer Romero pointed to her badge and reiterated that she was an officer with the Albuquerque Police Department.

According to Officer Romero, Lundstrom exhibited hostility and aggressiveness as soon as she told him why she was there.  Lundstrom admits that he was immediately suspicious that Officer Romero was not in fact a police officer and that her uniform and badge were fake.  At some point, Officer Romero noticed a black object in Lundstrom's hand and, concerned that it might be a weapon, drew her firearm, pointed it at Lundstrom, and demanded that he show his hands.  Meanwhile, Hibner heard Lundstrom raising his voice and joined him at the door.  At

3

first, she edged herself in front of Lundstrom, placing herself between him and Officer Romero. She claims that as she did this, Officer Romero's gun was pointed at her for approximately thirty seconds. When Lundstrom showed his hands, and Officer Romero determined that he was holding a telephone and not a weapon, she dropped her firearm to the low, ready position. Hibner exited Lundstrom's home, but Lundstrum shut the door and remained inside of his home. According to Hibner, she remained on the porch at first and attempted to engage in conversation with Officer Romero but was ignored.

It is unclear when and how many times Lundstrum shut the door on Officer Romero. Lundstrom claims that he did not shut the door until Officer Romero drew her weapon. Officer Romero, on the other hand, claims that Lundstrum "slammed the door on [her] face" as soon as she explained who she was and why she was there, even before she drew her weapon. Construing the facts in a light most favorable to the Plaintiff for purposes of Defendants motions, Lundstrom shut the door on Officer Romero at least once, after she drew her weapon.

It is undisputed that after Officer Romero drew her weapon and Lundstrom shut the door, Officer Romero took a cover position and requested back-up units. Officers Anthony Sedler, Eduoard Taylor, and Zazza Green responded to 5100 Mountain to assist Officer Romero. The information that the officers had when they arrived on the scene was that there was a "barricaded subject" inside of his home, that the subject was disorderly,[2] and that the call was in reference to a child welfare check. Officer Sedler positioned himself in front of the residence and took cover behind a vehicle with Officer Green next to him. Officer Apodaca was also in front of the residence. Officer Taylor, however, was in Lundstrom's backyard, a few yards from the back of

---

[2] [Doc. 73, Ex. F, at 28] (Officer Sedler testified that Officer Romero informed via radio that Lundstrom was "very 39," which is law enforcement's code for disorderly and/or aggressive toward the officer).

his house.  There is some dispute about whether Officer Taylor either opened a gate or jumped over a fence in order to gain entry to Lundstrom's backyard.  Although Officer Taylor testified that he does not remember opening a gate or jumping over a fence, Lundstrom insists that he must have used one of these methods in order to gain access to the backyard.

Lundstrom, who remained inside of his home, also called 911, requesting that officers be dispatched to his residence because there was a woman claiming to be a police officer at his door.  In fact, Officer Lorenzo Apodaca was initially dispatched to respond to Lundstrom's request for officers' assistance.  After verifying that Officer Romero was at Lundstrom's residence, the 911 dispatcher advised Lundstrom that the woman at his house was indeed a police officer.  Lundstrom remained unconvinced, at least at first.  Hibner, who remained on the porch, turned on the phone that she was carrying and overheard and participated in Lundstrom's conversation with the 911 dispatcher.  During this time, several officers who were positioned by the vehicles in Lundstrom's driveway directed Hibner to move toward them and to get away from the house.  Hibner eventually complied and was handcuffed, in a manner that she admits was not rough, and directed to sit on the curb of the sidewalk.

At some point after Lundstrom shut the door and retreated into his home, Officer Romero called the 911 dispatcher, requesting verification of the information supplied by Mohr.  During her conversation with the 911 dispatcher, Mohr gave her address and indicated that the officers could "come by" if they wanted  After contacting Mohr, the 911 dispatcher advised officers that Mohr was a retired San Diego police officer and that, although she didn't see anything, she "heard a female adult yelling at a small [child] who they have part-time custody of."

Meanwhile, both Officer Apodaca and dispatch operators instructed Lundstrom to exit his home, but he did not immediately do so.  During this time, officers were pointing their guns,

some with less than lethal force, at the door to Lundstrom's house.  From the back of the house, Officer Taylor could see Lundstrom pacing back and forth in his bedroom.  He testified that Lundstrum appeared "extremely frantic."  He advised the other officers of his observations via radio.  Before exiting his house, Lundstrom told the dispatcher, "And if they beat the crap out of me, I'm fighting back.  You got that?"  The dispatcher relayed this information to the officers positioned outside of Lundstrom's residence, telling them "[h]e's saying if [officers] do fight with him, he will fight back."

Lundstrom did eventually comply with requests to exit his house.  He exited with his hands up and in full view without resistance or evasion.  He claims that the officers were pointing guns at him as he was walking out.  He was instructed to turn around and walk backwards toward the officers, and his hands were handcuffed behind his back.   Next, Lundstrom claims that he was pressed up against the back of a truck and then pulled aside and shoved to the ground.  He recalls having an elbow or a knee in the back of his head, having his arm twisted, and being "rolled up onto [his] head."  Plaintiffs claim that as a result of this encounter, Lundstrom sustained various injuries, including a sore neck.

After just a short time, Lundstrom was picked up and placed inside of a police vehicle.  It is unclear which Defendant, if any, handcuffed Lundstrom or placed him in the vehicle.  In Lundstrom's estimation, he was handcuffed and in the police vehicle for thirty to forty-five minutes while officers searched his home and interviewed both Lundstrom and Hibner.

During this time, officers entered Lundstrom's house to search for other occupants.[3]

---

[3] The record reveals some inconsistencies with regard to which officers entered the interior of Lundstrom's home.  Officer Sedler testified that he did not enter Lundstrom's home.  [Doc. 73, Ex. F, at 27.]  However, according to Officer Green's testimony, she, Officer Apodaca *and Officer Sedler* entered Lundstrom's home to search for additional occupants.  [Doc. 73, Ex. E, at 33.]  Moreover, Hibner testified that she saw two male officers enter Lundstrom's home.  [Doc. 104, Ex. 2, at 56.]  In any event, it is undisputed that neither Officer Romero nor Officer

Hibner estimated that the officers were inside of Lundstrom's home for approximately ten

minutes. According to Officer Apodaca and Officer Green, they checked every room, including

closets and any space that a person could occupy.   According to Lundstrom, however, when he

returned to his house, his drawers and kitchen cabinets were open, the drawers under his bed

were open, and his DVDs and CDs had been pulled out and taken out of alphabetical order.

Officer Green maintains that, during the search, the officers did not open drawers or look

through Lundstrom's media.

      Upon being removed from the car, Lundstrom's handcuffs were released and he was

placed on the sidewalk next to Hibner.  Hibner's handcuffs had already been removed.

Lundstrom and Hibner sat side-by-side on the curb for a few minutes before asking, "What

happens next?"  They were told that they were free to go.  They were never charged with any

crime.

## II.  STANDARD

      Summary judgment is generally appropriate when a court determines that "there is no

genuine dispute over a material fact and the moving party is entitled to judgment as a matter of

law." *Thrasher v. B & B Chem. Co.*, 7 F.3d 995, 996 (10th Cir. 1993).  Under Rule 56(c), the

mere existence of some alleged factual dispute between the parties does not defeat an otherwise

properly supported summary judgment motion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986).  Rather "[o]nly disputes over facts that might affect the outcome of the suit under

the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

      To carry its initial burden, the moving party need not negate the nonmoving party's

---

Taylor entered the interior of Lundstrom's home.

claim. *See Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997). Instead, the movant bears

only the burden of "showing – that is, point out to the district court – that there is an absence of

evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

(1986). Once the moving party meets its burden, the nonmoving party must "go beyond the

pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and

admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.*

(quoting Fed. R. Civ. P. 56(e)). A plaintiff cannot rely upon conclusory allegations or

contentions of counsel to defeat summary judgment but must produce some specific factual

support of its claim. *See Pueblo v. Neighborhood Health Centers, Inc.*, 847 F.2d 642, 649 (10th

Cir. 1988); *Fritzsche v. Albuquerque Municipal Sch. Dist.*, 194 F. Supp. 2d 1194, 1206 (D.N.M.

2002). "Where the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith Radio

Corp.*, 475 U.S. 574, 578 (1986). Upon a motion for summary judgment, a court "must view the

facts in the light most favorable to the nonmovant and allow the nonmovent the benefit of all

reasonable inferences to be drawn from the evidence. *Kaus v. Standard Ins. Co.*, 985 F. Supp.

1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). If there is no genuine issue of

material fact in dispute, then a court must determine whether the movant is entitled to judgment

in its favor as a matter of law. *See, e.g., Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996);

*Celotex*, 477 U.S. at 322.

     The standard for analyzing a motion for summary judgment shifts slightly if, as here, a

defendant raises qualified immunity as a defense in a suit under 42 U.S.C. Section 1983.

Qualified immunity bars Section 1983 suits against defendants in their individual – but not

official – capacities. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 167 (1985). In a summary

judgment motion premised on qualified immunity, although the court should still "review the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate that the plaintiff has satisfied [a] heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Medina v. Cram*, 252 F.3d 1124, 1127 (10th Cir. 2001). First, the plaintiff must establish that the defendant's actions violated a constitutional or statutory right. *Id.* at 1128. Second, if the plaintiff establishes such a violation, he must then demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct. *Id.*

Even under a qualified immunity analysis, "the plaintiff can no longer rest on the pleadings, see Fed. Rule Civ. Pro. 56, and the court looks to the evidence before it (in the light most favorable to the plaintiff)." *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1299 (10th Cir. 2004); *Serna v. Colorado Dep't of Corr.*, 455 F.3d 1146, 1150-51 (10th Cir. 2006). Indeed, the plaintiff has the obligation to present some evidence to support his allegations, and merely pointing to an unsworn complaint is insufficient. *Serna*, 455 F.3d at 1150-51.

### III. DISCUSSION

Defendants maintain that they are entitled to summary judgment in their favor on each of Plaintiffs' claims. Specifically, Defendants assert that they are entitled to qualified immunity from suit with regard to Plaintiffs' constitutional claims, including claims of an unreasonable seizure of both Lundstrom and Hibner, excessive force against Lundstrom, and an unreasonable search of Lundstrom's home.[4] Finally, Defendant's claim that they are entitled to immunity

---

[4] Although Plaintiffs argue in their motion for summary judgment that the search of Lundstrom and Hibner's bodies was unlawful, such an allegation is absent from their Third Amended Complaint, and is therefore not considered.

from Plaintiffs' state law claims under the New Mexico Tort Claims Act.  Plaintiffs, on the other hand, claim that the undisputed facts establish that Defendants unlawfully detained, seized, and arrested both Lundstrom and Hibner and that Defendants unlawfully entered and searched Lundstrom's home and backyard.

## A.  CONSTITUTIONAL CLAIMS

In determining whether a seizure comports with the Fourth Amendment, courts have identified three categories of police-citizen encounters:  1) consensual encounters, which do not implicate the Fourth Amendment; 2) investigative detentions or stops, which are Fourth Amendment seizures of limited scope and duration; and 3) arrests, which are the most intrusive of Fourth Amendment seizures and which are only reasonable if supported by probable cause. *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000).  These categories are not static, as an encounter may escalate or de-escalate to a different category.  *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996).  Thus, courts must analyze each stage of the police-citizen encounter, ensuring that the requisite level of cause was present at each stage.  *Id.*

In the Court's view, the constitutionally-significant encounters between Defendants and Lundstrom unfolded in the following stages:  1) the initial encounter between Officer Romero and Lundstrom; 2) Officer Romero's pointing of her gun at Lundstrom; 3) Lundstrom's retreat into the interior of his house 4) Officer Taylor's entrance into Lundstrom's backyard; 5) officers' handcuffing of Lundstrom and placing him in a police vehicle; 6) officers' entrance into the interior of Lundstrom's house; and 7) officers' search of the interior of Lundstrom's home.  In addition, the Court considers the constitutionally-significant encounters between Defendants and Hibner to have unfolded in the following stages: 1) Officer Romero's pointing of her gun in Hibner's direction; 2) Hibner's exit from Lundstrom's home; and 3) officers' handcuffing of

10

Hibner and placing her on the curb.  The Court's analysis of each stage of these encounters follows, although not chronological.

    1.  <u>**Seizure of Lundstrom**</u>

    In Count I of Plaintiffs' Third Amended Complaint, Lundstrom claims Defendants violated his Fourth Amendment right to be free from unreasonable seizures.  In determining the validity of Lundstrom's claim, the Court must first determine at what point during Defendant's interactions with Lundstrom the Fourth Amendment was implicated.  In their own motion for summary judgment, Plaintiffs contend that Officer Romero unlawfully "seized" Lundstrom when she drew her weapon and pointed it at him.  [Doc. 104, at 12.]  However, in their response to Defendants' motion, they allege that Lundstrom was seized by Officer Romero "as soon as she approached his door." [Doc. 83, at 11.]  Defendants, on the other hand, claim that Lundstrom was lawfully "seized" only after he exited his home and was handcuffed.  [Doc. 73, at 9, ¶ C.]

    *a.  Initial Encounter Between Officer Romero and Lundstrom*

    It is undisputed that Lundstrom voluntarily opened the door in response to Officer Romero ringing his doorbell. Officer Romero identified herself and informed Lundstrom that she was there to check on the welfare of a child.  The law provides that a consensual encounter is underway when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and terminate the encounter.  *Florida v. Royer*, 460 U.S. 491, 497-98 (1983).  The relevant inquiry is not, as Plaintiffs suggest, whether Officer Romero had intentions of allowing Lundstrom to terminate their encounter from the outset, but whether she restrained Lundstrom's liberty "by means of physical force or show of authority."  *See Holland v. Harrington*, 268 F.3d 1179, 1187 (10th Cir. 2001) (reasoning that a seizure occurs only when the officer, by means of physical force or show of authority, has in

some way restrained the liberty of the citizen); *United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996) (concluding that the subjective intentions of officers is irrelevant to Fourth Amendment analysis).  There is no evidence that by merely identifying herself and informing Lundstrom why she was there, Officer Romero restrained Lundstrom's liberty.  *United States v. Daoust*, 916 F.2d 757, 758 (1st Cir. 1990) (noting that officers "may lawfully go to a person's home to interview him").  Nor would a reasonable person in Lundstrom's situation likely feel that they were not free to terminate the encounter with Officer Romero.  In fact, it appears that Lundstrom himself felt free to terminate the encounter, as he closed the door on Officer Romero at least once.

Because Officer Romero's presence at Lundstrom's door and their initial encounter did not rise to the level of a seizure under the Fourth Amendment, Plaintiffs have not shown the violation of a clearly established constitutional right on that basis.  Officer Romero, and all Defendants for that matter, are entitled to qualified immunity with regard to Plaintiffs' claims arising from Officer Romero's initial encounter with Lundstrom before she drew her weapon..

### b.  Officer Romero Pointing Her Gun at Lundstrom

Whether Lundstrom was seized when Officer Romero drew her weapon and pointed it at him is a tougher question.  Concerned that a black object in Lundstrom's hand might be a weapon, Officer Romero aimed her gun at Lundstrom, demanding that he show his hands. Lundstrom complied, although compliance might not have been immediate.  After showing his hands, Officer Romero was able to determine that he was holding a telephone and not a weapon. At that point she dropped her firearm to the low, ready position.  Lundstrom then closed the door and retreated into his house.

While Plaintiffs maintain that the "seizure" of Lundstrom effectively escalated into an

12

arrest, the drawing and aiming of a gun does not by itself escalate a detention into an arrest or render a detention unreasonable.  *United States v. Merritt*, 695 F.2d 1263, 1273 (1983) ("[T]he use of guns in connection with a stop is permissible where the police reasonably believe they are necessary for their protection.").

An investigative detention, as opposed to an arrest, occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."  *See Adams v. Williams*, 407 U.S. 143, 146 (1973).  Inasmuch as the detention is not consensual and leads a reasonable person to believe that he is not free to leave, it constitutes a seizure under the Fourth Amendment and must meet two distinct requirements in order to be reasonable.  First, the officer must have "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion."  *Terry v. Ohio*, 392 U.S. 1, 21 (1968)  Second, the investigative detention that follows must be "reasonably related in scope to the circumstances" which justify the stop in the first place.  *Id.* at 20.  Indeed, the Fourth Amendment imposes limitations on both the duration of the detention and the manner in which it is carried out.  *United States v. Holt*, 264 F.3d 1215, 1229 (10th Cir. 2001); *Royer*, 460 U.S. at 500. Where officers exceed the limits of an investigative detention, the detention "becomes an arrest that must be supported by probable cause." *United States v. Neff*, 300 F.3d 1217, 1220 (10th Cir.2002).  Yet "bright-line rules do not govern the permissible scope of an investigative detention," but "common sense and ordinary human experience trump rigid criteria."  *United States v. Copening*, 506 F.3d 1241, 1248 (10th Cir. 2007) (internal quotations omitted).

Defendants contend that Officer Romero's act of pointing her weapon at Lundstrom was not a seizure at all, because Lundstrom did not submit to Officer Romero's show of authority

and instead shut his door.  Defendants cite *Reeves v. Churchich,* 484 F.3d 1244 (10th Cir. 2007) for the proposition that no seizure occurs, even when an officer points her weapon at a subject, if the subject does not comply with the officer's assertion of authority.  It is Defendant's position that because Lundstrom closed his door without entertaining Officer Romero's inquiries or allowing her to enter his home, even after she drew her weapon, he did not submit to her show of authority.

In *Reeves,* the defendant officers allegedly pointed their weapons at the plaintiffs and made verbal commands, ordering them to "get down on the ground" and to remain in their apartment.  *Reeves,* 484 F.3d at 1253.  The Tenth Circuit determined that although the alleged actions by the defendant officers were assertions of authority, the plaintiffs had not submitted to these assertions, and therefore no seizure had occurred.  *Id.* at 1251.  Thus, the officers in *Reeves,* at most, "attempted to seize" the Plaintiffs, which is insufficient to constitute a seizure for purposes of Fourth Amendment analysis.  *Id.* at 1253.

On the Court's review of the relevant facts, it concludes that a seizure, albeit brief, did occur when Officer Romero pointed her weapon at Lundstrom and demanded that he show his hands. Officer Romero in effect escalated the encounter into a seizure, not because she had reasonable suspicion or probable cause to believe that Lundstrom had committed a crime, but in order to alleviate a perceived threat to her own safety.  Because the Court concludes that Lundstrom in fact complied with Officer Romero's command to show his hands while she held him at gunpoint, *Reeves* is irrelevant to the Court's analysis on this point.  Having determined that a seizure did occur, the Court turns next to the issues of whether the seizure escalated into an arrest and whether the seizure was reasonable under the circumstances.

The Court determines that Plaintiffs have failed to produce any evidence demonstrating

that the seizure of Lundstrom at gunpoint escalated into an arrest. The seizure of Lundstrom was limited in purpose -- to determine whether Officer Romero's safety was in jeopardy because of a potential weapon in Lundstrom's hands.  It was also limited in duration, lasting just over thirty seconds in Hibner's estimation.  Given the limited purpose and the brevity of the detention, the encounter is properly characterized as an investigative detention, not an arrest.

Nevertheless, the "display of weapons . . . should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at the time." *Holland v. Harrington*, 268 F.3d 1179, 1192 (10th Cir. 2001). The Court notes that Officer Romero was responding to a 911 call advising that a child was being beaten at 5100 Mountain, a situation that could have no doubt proven volatile.  Further, upon arriving at Lundstrom's residence, Officer Romero heard a high-pitched noise and was unable to discern whether the noise came from a child or an adult.  Then, Lundstrom, who answered the door and denied the presence of any children, was holding a black object in his hand, which Officer Romero perceived to be a weapon.

Given that it was nighttime and that the circumstances at Lundstrom's home were largely unknown, it cannot be said that Officer Romero's perception was unreasonable.  Nor can it be said that Officer Romero was without reasonable cause to believe that Lundstrom posed a danger to her safety, especially when assessing the situation "from the perspective of a reasonable officer on the scene," recognizing the fact that the officer may be "forced to make split-second judgments" under stressful and dangerous conditions.  *Gross v. Pirtle*, 245 F.3d 1151, 1158 (10th Cir. 2001).

Under the circumstances facing Officer Romero, the Court determines that seizing Lundstrom at gunpoint was *reasonable* in the face of a reasonably perceived threat to Officer

15

Romero's own safety.  Moreover, once the potential threat was obviated by her determination

that Lundstrom was not in fact holding a weapon, Officer Romero lowered her gun,[5] and

Lundstrom shut the door and retreated into his home.  The detention necessarily ceased as

Lundstrom's compliance ceased.

In sum, because Plaintiffs have failed to show that Officer Romero subjected Lundstrom

to an unreasonable seizure by pointing her weapon at him, Officer Romero is entitled to

qualified immunity in this regard.

### c.  Lundstrom's Retreat into the Interior of his House

Plaintiffs apparently contend that Lundstrom was seized within the meaning of the

Fourth Amendment even while he was within his home.  They argue that "[b]ecause the seizure

of Mr. Lundstrom took place while Mr. Lundstrom was in his home, the defendants were

required to have probable cause that Mr. Lundstrom committed a crime and a warrant or exigent

circumstances justifying the lack of a warrant."  [Doc. 104, at 12] (citing *Payton v. New Yor*k,

445 U.S. 573, 576, 590 (1980)).

In *Payton*, the officers used crowbars to break open the door to the defendant's house in

an attempt to arrest him for criminal activity.  *Payton*, 445 U.S. at 576.  The Supreme Court held

that the Fourth Amendment prohibits the police from making a warrantless and nonconsensual

entry into a suspect's home, even in order to make a routine felony arrest.  *Id.* at 576. The Court

reasoned that "[i]n terms that apply equally to seizures of property and to seizures of persons, the

Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent

---

[5] Even if Officer Romero kept her weapon in the low, ready position for some time after determining that Lundstrom was not holding a weapon, such an action was not unreasonable under the circumstances.  *See Holland*, 268 F.3d 1179 (noting that it may be unreasonable to aim a loaded firearm directly at a person, "in contrast to simply holding the weapon in a fashion ready for immediate use," when the officer has no reasonable cause to believe that the person poses a danger to the officer or others).

16

circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590.

In the Court's view, Plaintiff's argument is only plausible when considering *Payton* in conjunction with *United States v. Maez*, 872 F.2d 1444 (10th Cir. 1989), a case not cited by Plaintiffs in this context.   There, the Tenth Circuit significantly extended *Payton's* holding, concluding that the defendant was unlawfully arrested while in his home, even though officers never entered his home. *Id.* at 1451.  Under the facts of *Maez*, approximately ten officers, including police officers and SWAT team members, surrounded the mobile home in which the defendant and his family were located. *Id.* at 1447.  The officers' intended to arrest the defendant for his part in a bank robbery, and although the officers had probable cause to effect the arrest, they did not have a warrant to enter his home. *Id.* at 1446-47. With rifles pointed at the home, officers commanded the occupants to exit over loudspeakers. *Id.* at 1447.  The defendant's wife saw the officers with their rifles aimed at the house, and she observed her son being searched and handcuffed. *Id.* at 1450.  The Court determined that given the "frightening circumstances," including the number of officers surrounding the trailer with weapons drawn and the use of loudspeakers, a reasonable person would believe that he had to submit to the show of authority. *Id.*  Concluding that the show of force used invaded the privacy of the defendant's home to the same extent as a physical intrusion, the Court held that the defendant was effectively arrested while within his home. *Id.* at 1451.

Nevertheless, this case is factually distinguishable from *Maez* in that about half the number of officers were at Lundstrom's home, loudspeakers were not used, and Lundstrom could not see the officers with weapons drawn until he made his way off the porch.  More importantly, the government in *Maez* never claimed that exigent circumstances existed, at least at the trial level, *see id.* at 1453, while Defendants here have insisted from the outset that exigent

17

circumstances *did* exist.  As the *Maez* Court acknowledged, "if exigent circumstances exist, the constitutional bar against a suspect's arrest in his home without a warrant does not apply." *Maez*, 872 F.2d at 1452 (citing *Payton*, 445 U.S. at 590).  Finally, the context under which the officers were at the defendant's home in *Maez* was entirely different from the context here. There, the officers had probable cause to arrest the defendant for suspected criminal activity when they arrived at his home, but no apparent exigency for entering his home.  Here, the officers were operating under their community caretaker function, conducting a child welfare check, and exigent circumstances existed for their entrance into Lundstrom's home.  For these reasons, the Court concludes that Lundstrom was not arrested while within his home.

Similarly, the Court further concludes that Lundstrom was not seized or detained while within his home.  As discussed above, no seizure occurs when the subject does not comply with the officer's assertion of authority.  *Reeves v. Churchich,* 484 F.3d 1244, 1251 (10th Cir. 2007). Here, Lundstrom retreated into his home and failed to comply with Defendants' assertions of authority until he exited his home.  Although Lundstrom may well have refused to leave his home because he was concerned that Defendants were not genuine police officers, the subjective reasons behind his failure to submit to officers' assertions of authority are immaterial to the Fourth Amendment analysis.  *Reeves*, 484 F.3d at 1253; *Bella v. Chamberlain*, 24 F.3d 1251, 1256 n.5 (10th Cir. 1994).

In short, because Lundstrom was neither seized or arrested while within his home by Defendants' show of authority, the Fourth Amendment was not implicated.

### d. Handcuffing Lundstrom and Placing him in a Police Vehicle

Viewing the facts in the light most favorable to Plaintiffs, after finally exiting his home,

Lundstrom was handcuffed and placed in an officer's vehicle.[6]  There is no question that Lundstrom was thereby seized for Fourth Amendment purposes.  The issues presented by this stage of the encounter are whether Lundstrom's seizure ripened into an arrest and whether the seizure ultimately violated Lundstrom's Fourth Amendment rights.

Notably, Plaintiffs devote most of their argument to the proposition that Lundstrom's arrest was not properly supported by probable cause.  [Doc. 83, at 12.]   This argument presupposes that Lundstrom was in fact arrested and not merely detained.  However, under Fourth Amendment analysis, a person is not necessarily arrested merely because he is handcuffed or placed in a police car.  *See, e.g., United States v. Neff*, 300 F.3d 1217, 1220 (10th Cir. 2002).  Yet a detention may escalate into an arrest if it exceeds the proper scope of a detention as dictated by "common sense and ordinary human experience."  *Id.*

According to Lundstrom's estimation, he remained handcuffed and in the officer's vehicle for approximately thirty to forty-five minutes.  Lundstrom was seized, at least in part, so that officers could search his home for the child purportedly in need of assistance.  In addition, Lundstrom may have reasonably been detained because he posed a safety risk to the officers conducting the investigation.  *See United States v. Shareef*, 100 F.3d 1491, 1502 (10th Cir. 1996) (noting that "police officers should not be required to take unnecessary risks in performing their

_____

[6] Defendants claim that because none of the named Defendants handcuffed Plaintiff, and individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation, Defendants are entitled to qualified immunity. Defendants have presented evidence that Lundstrom was not handcuffed by Officer Romero, *see* [Doc. 73, Ex. C, at 73-75], Officer Sedler, *see* [Doc. 73, Ex. F, at 15], Officer Apodaca, *see* [Doc. 104, Ex. F, at 23-24], or Officer Taylor, *see* [Doc. 73, Ex. G at 21.]   Moreover, according to Lundstrom's testimony, it was a male officer who handcuffed him, *see* [Doc. 73, Ex. I, at 50], eliminating the only remaining Defendant officer, Officer Green. Yet, several of the Defendant officers testified that Lundstrom was, in fact, placed in handcuffs.  *See* [Doc. 104, Ex. 7, at 20:7-17; Ex. 4, at 44:17-23.]  As such, there is a disputed fact as to which officer placed Lundstrom in handcuffs.  Even so, because Plaintiffs have not shown that this detention resulted in a violation of his constitutional rights, as discussed below, all of the officers are entitled to qualified immunity, regardless of who actually participated in the seizure.

duties" and that "they are authorized to take such steps as [are] reasonably necessary to protect

their personal safety.")  Accordingly, the Court concludes that the duration and purpose of this

seizure did not cause it to escalate into an arrest.  Rather, Lundstrom was merely detained,

obviating the probable cause requirement.[7]

     The Tenth Circuit has acknowledged that officers engaged in their community caretaking

function may reasonably detain a person, regardless of any suspected criminal activity, in order

to ensure the safety of the public or the individual.  *United States v. King*, 990 F.2d 1552, 1560

(10th Cir. 1993); s*ee also Novitsky v. City of Aurora*, 491 F.3d 1244 (10th Cir. 2007).  Although

a person may sometimes be lawfully detained under such circumstances, "a person's Fourth

Amendment rights are not eviscerated" simply because officers were not conducting a criminal

investigation.  *King*, 990 F.2d at 1560.  Rather, even seizures in this context must be based on

"specific articulable facts" and require a balancing of the governmental interest in the officer's

exercise of his community caretaking function and the individual interest in being free from

arbitrary government interference.  *Id.* at 1560.

     Here, Officer Romero responded to Lundstrom's home in her community caretaking

function, to conduct a child welfare check.  She and the other responding officers were presented

with numerous unknowns, such as whether Lundstrom would be resistant or combative and

whether he would arm himself, whether there was indeed a child inside who was in need of

assistance, and whether there were other occupants inside Lundstrom's home who could pose a

safety threat to officers.  Upon arriving at the scene, the officers had information that Plaintiff

---

[7] Even if Lundstrom's seizure *did* escalate into an arrest, Defendants had probable cause to believe that Lundstrom had violated a crime, namely Refusing to Obey, contrary to Albuquerque Code of Ordinances § 12-2-19. Plaintiffs argue that such an analysis is improper given officer testimony that Lundstrom was not arrested for any crime.  However, the subjective intentions of the officers are irrelevant to Fourth Amendment analysis.  *Sanchez*, 89 F.3d at 718.

had barricaded himself in his home, that he was disorderly, and that the original call was in reference to a child welfare check.  These officers were entitled to rely upon information relayed to them by both dispatchers and Officer Romero so long as their reliance was objectively reasonable.  *Oliver v. Woods*, 209 F.3d 1179, 1191 (10th Cir. 2000).  And they could not "be expected to cross-examine their fellow officers about the foundation for the transmitted information." *Id.* at 1191.

Further, even viewing the facts in a light most favorable to Plaintiffs, Lundstrom was uncooperative.  He denied Officer Romero entrance into his home to conduct a child welfare check, and he shut the door on her at least once.  More importantly, he did not immediately exit his home when Officer Apodaca and the 911 dispatcher both instructed him to do so.  He could be seen pacing back and forth in his bedroom, and Officer Taylor advised that he appeared "extremely frantic."  Moreover, the 911 dispatcher reported to the officers, "[h]e's saying if [officers] do fight with him, he will fight back."  Indeed, this case presents the classic situation in which "a plaintiff's own actions in reaction to a legitimate law enforcement encounter result in escalating volatility and danger justifying the subsequent actions of the law enforcement officers involved." *Latta v. Keryte*, 118 F.3d 693, 698 (10th Cir. 1997).

In the meantime, the 911 dispatcher relayed to officers that the 911 caller was a retired San Diego police officer and that, although she didn't see anything, she "heard a female adult yelling at a small [child] who they have part-time custody of."  The fact that the 911 caller was not anonymous, and was in fact a retired police officer, lent credence to her report.  *See United States v. Neff*, 300 F.3d 1217, 1221 (noting parenthetically that there is "presumptive reliability of citizen informers").  Further, the information provided by Mohr also gave the impression that she had some personal knowledge of the child and his relationship to the adults at 5100

21

Mountain.       Based on the evidence before it, the Court concludes that Mohr's 911 call coupled with Lundstrom's uncooperative behavior created the requisite specific, articulable basis for officers to believe that a person inside of Lundstrom's home might be in need of assistance and to conduct further investigation.  Because Lundstrom had effectively impeded the child welfare investigation up to that point and had given officers an objectively reasonable basis for considering their safety to be at risk, his detention was justified at its inception.

Further, in balancing the respective Fourth Amendment interests, the Court notes that by Lundstrom's own estimations, he was only handcuffed and detained in the officer's car for thirty or forty-five minutes while the officers searched his home and concluded their investigation. *Shareef*, 100 F.3d at 1496-98 (holding that an hour-and-a-half investigative detention, in which the detainees were handcuffed, was not unreasonable).  On the other hand, the government had a compelling interest in investigating whether a small child, potentially in danger of physical harm and unable to care for himself, was within Lundstrom's home.  The Court concludes that the government's strong interest was sufficiently important to outweigh the relatively brief and minor intrusion placed upon Lundstrom's freedom while officers concluded their investigation. As such, Plaintiffs have failed to show that the seizure of Lundstrom violated his constitutional rights and Defendants are, therefore, entitled to qualified immunity with regard to this seizure.

**2.  Force Used to Effectuate Lundstrom's Seizure**

Plaintiffs contend that officers used excessive force in detaining Lundstrom by "seizing him, handcuffing him, shoving his neck into the ground, and pointing several guns at him." [Doc. 58, at 7, ¶ 47.]  The Court has determined that the first seizure of Lundstrom took place when Officer Romero briefly pointed her gun at him and directed him to show his hands.  The second seizure of Lundstrom took place when he exited his  home with his hands up while

22

officers were pointing guns at him. During the second seizure, Lundstrom was instructed to turn around and walk backwards towards the officers, and his hands were handcuffed behind his back. Lundstrom claims that he was pressed up against the back of a truck and then pulled aside and shoved to the ground. He recalls having an elbow or a knee in the back of his head, having his arm twisted, and being "rolled up onto [his] head." Plaintiffs claim that as a result of this encounter, Lundstrom sustained various injuries, including a sore neck.

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court addressed the proper standards for an excessive force claim in the context of a qualified immunity analysis. The Court concluded that the appropriate standard in this context is whether the force used violated a clearly established Fourth Amendment protection. *Id.* at 207. The first inquiry is whether, on a favorable view of the parties submissions, Plaintiffs have shown a constitutional violation. *Id.* at 201. If a constitutional violation is shown, the Court proceeds to the second inquiry - whether the constitutional right was "clearly established," or whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted. *Id.* at 201-02.

With regard to the first inquiry, the use of force is a violation of the Fourth Amendment if it is excessive under objective standards of reasonableness. *Id.* at 201-02. In analyzing the reasonableness of force used in effecting a seizure, the Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Significantly, the reasonableness of the force employed must be evaluated not from hindsight but from the perspective of a reasonable officer at the scene. *Id.* at 396-97. While investigative detentions must generally be fairly nonintrusive, officers may take necessary steps to protect themselves if the circumstances reasonably warrant such measures. Indeed, the right to effect a

23

detention carries with it the right to use some degree of physical coercion or threat thereof. *Graham*, 490 U.S. at 396.

Even in the context of investigative detentions, the Supreme Court and/or Tenth Circuit have deemed reasonable the use of handcuffs, pushing and shoving, placing individuals on the ground, pointing weapons, and detention in vehicles.  *See, e.g.*, *Thompson v. City of Lawrence, Kan.*, 58 F.3d 1511 (10th Cir. 1995) (handcuffing of bystander during arrest of a suspect in the same vicinity was objectively reasonable); *Saucier*, 533 U.S. at 209 (shove by officers in effecting detention of protester was reasonable); *Graham*, 490 U.S. at 396 ("Not every push or shove, even if it later seems unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment"); *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1030-31 (10th Cir. 1997) (grabbing a suspect by the arm and placing him face down on the pavement in effecting detention was not unreasonable); *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993) (noting that nine courts of appeal, including the Tenth Circuit, have determined that using handcuffs or placing individuals on the ground during an investigative detention does not constitute excessive force); *Saucier,* 533 U.S. at 212 n.3 (finding no excessive force in detaining protester in police vehicle).

The nature and quality of the intrusions complained of -- including handcuffing Lundstrom, shoving his neck  to the ground, aiming weapons at him, and detaining him in an officer's vehicle -- are outweighed by the countervailing governmental interests in both conducting an investigation into the welfare of a small child and ensuring officer safety.  The Court must take into consideration that, when making judgments about the force that is necessary, officers often must "make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving."  *Graham*, 490 U.S. at 396-97.  Here, not only had Lundstrom

proven uncooperative, but he appeared "extremely frantic" and had threatened to "fight back." Thus, officers had reason to be concerned for their safety and were reasonably permitted to take the precautionary measures alleged in order to protect themselves and to neutralize potential danger.

Even if this Court were to reach the second inquiry, which is unnecessary considering its determination on the first inquiry, Plaintiffs have not identified any case demonstrating a clearly established rule prohibiting the officers from acting as they did, and the Court is unaware of any such rule. Nor would it be clear to a reasonable officer that the conduct involved here was unlawful in the situation the officers confronted. Even to the extent that the force used by Defendants could have arguably exceeded the proper scope of an investigative detention, such an error as to the degree of force necessary under the circumstances was a reasonable mistake in light of legitimate officer safety concerns and the "sometimes 'hazy border between excessive and acceptable fore.'" *Saucier*, 533 U.S. at 205. "The concern of the [qualified] immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Id.* at 205. Here, this concern weighs in favor of granting qualified immunity to Defendants.

Simply put, Plaintiffs have failed to allege the violation of a clearly established constitutional right based on the force employed by the officers in effecting Lundstrom's detention. Defendants are therefore entitled to qualified immunity on Plaintiffs' allegation of excessive force.

### 3. Seizure of Hibner

On review of Plaintiffs' Third Amended Complaint, the Court can surmise that the single constitutional violation alleged with regard to Plaintiff Hibner is a violation of the right to be

free of unreasonable seizures.  In determining the validity of this claim, the Court must again determine at what point during her encounters with Defendants the Fourth Amendment was implicated.

Hibner claims that she was first seized by Defendants when Officer Romero pointed her weapon at Hibner's face.  [Doc. 85, at 11.]  According to Plaintiffs, this seizure was either continued or renewed as Hibner was surrounded by officers with weapons drawn, ordered to comply with officers commands, and handcuffed.  *Id.* at 11-12.  Defendants maintain, just as they did with regard to Lundstrom's unreasonable seizure claim, that Hibner could not have been seized when Officer Romero aimed her weapon at Hibner and/or Lundstrom, because Hibner did not submit to Officer Romero's show of authority.

It is undisputed that Hibner went to the door to investigate when she heard Lundstrom raise his voice and that she edged herself in front of Lundstrom.  Hibner claims that as she did this, Officer Romero was pointing a gun at Lundstrom and then, as she got in front of him, the gun was pointed at her.  However, based on the evidence before the Court, Officer Romero did not issue any commands to Hibner during this time, but instead only instructed Lundstrom to show his hands.  Furthermore, Hibner exited Lundstrom's home during this encounter and remained on the porch with Officer Romero, while Lundstrom remained inside.

Based on these facts, the Court finds that Hibner was not seized within the meaning of the Fourth Amendment at this stage of the encounter, not because Hibner failed to submit to a show of authority, but because the show of authority was not directed at her.  *See Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) (holding that seizure under Fourth Amendment "requires an intentional acquisition of physical control"); *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (holding that authorities may not seize any person other than one who was a

26

deliberate object of their exertion of force").  Officer Romero aimed her weapon at Lundstrom until she could discern whether he was holding a weapon.  Her gun was only incidentally pointed in Hibner's direction as Hibner edged herself in front of Lundstrom.  These facts do not support a seizure of Hibner under the Fourth Amendment.

Hibner, who remained on the porch at first, turned on the phone she was carrying and overheard and participated in Lundstrom's conversation with the 911 dispatcher.  During this time, several officers who were positioned by the vehicles in Lundstrom's driveway requested that Hibner move toward them and get away from the house.  Hibner eventually complied and was handcuffed, in a manner that she admits was not rough, and directed to sit on the curb of the sidewalk. As soon as the search of Lundstrom's home and the officers' investigation was completed, Hibner was released from handcuffs and told that she was free to go.  Based on the evidence before the Court, it appears that Hibner was detained for less than an hour.[8]

Defendants admit that once Hibner complied with the officers directions and was handcuffed, she was seized within the meaning of the Fourth Amendment.  They contend, however, that this brief period of "protective detention" was reasonable.  They rely heavily on *Thompson v. City of Lawrence*, 58 F.3d 1511 (10th Cir. 1995).

In *Thompson*, police officers entered Ward Thompson's business in order to arrest him, not realizing that an innocent patron, Frances Wisdom, and her son were present.  *Id.* at 1514.  Upon discovering Wisdom, officers handcuffed her and shoved her to the floor with weapons drawn.  *Id.*  Wisdom argued that she had been subjected to an unreasonable seizure and

---

[8] The CAD indicates that Hibner was "in custody" at 21:52, and that Lundstrom was "in custody" at 21:57. [Doc. 96, Ex. 4.]  As noted earlier, Lundstrom estimates that he was handcuffed and in the officer's vehicle for thirty to forty-five minutes.  When Lundstrom got out of the vehicle, Hibner's handcuffs had already been removed.  Thus, even viewing the evidence a light favorable to Plaintiffs, Hibner was detained and in handcuffs for no more than fifty minutes.

excessive force, but the *Thompson* Court disagreed.  *Id.* at 1516.  The Court concluded that "[t]he government interest in securing the area around Thompson and protecting officers from potential danger [was] sufficient to justify the temporary detention of Wisdom."  *Id.* at 1517.  The Court further concluded that "[g]iven the volatility of the situation, . . . it was objectively reasonable for officers to temporarily restrain Wisdom, whose relationship to Thompson and possible reaction to the situation were unknown."  *Id.*

Similarly, here, officers were faced with a potentially volatile situation, and Hibner's possible reaction was unknown, especially given that Hibner herself was somewhat reluctant to comply with officers' directions at first.  Moreover, officers had an interest in securing the area as Lundstrom remained "barricaded" in his house, both for the officers' own safety and for that of Hibner.  As the Tenth Circuit concluded in *Merritt*, "[w]henever the police confront an individual reasonably believed to present a serious and imminent danger to the safety of the police and public, they are justified in taking reasonable steps to reduce the risk that anyone will get hurt."  *Merritt*, 695 F.2d at 1274.  Lundstrom's uncooperative and frantic behavior provided a reasonable basis for officers to believe that their safety, and that of any other person in or around Lundstrom's home, was in danger.  Accordingly, officers were justified in directing Hibner away from the home and restraining her with the use of handcuffs while the matter was sorted out.

In addition, the Court is also cognizant of the fact that Mohr, in her 911 call, referenced a "woman" yelling at the small child.  Therefore, the officers had some basis for thinking that Hibner herself might have been involved in the alleged mistreatment of the small child.  This provides only additional justification for the temporary detention of Hibner during the course of the child welfare investigation.

28

Again, the Tenth Circuit has concluded that an officer engaged in a community caretaking function may, under some circumstances, detain a person. *See, e.g.*, *King*, 990 F.2d at 1560-61. Further, because the detention of Hibner, like that of Lundstrom, was objectively reasonable and limited in both duration and purpose, it did not constitute a Fourth Amendment violation. *See Neff*, 300 F.3d at 1220. Consequently, Hibner has shown no violation of her constitutional rights, and Defendants are entitled to qualified immunity with regard to her single constitutional claim.

### 4. Entrance into Interior of Lundstrom's Home

The Fourth Amendment does not prevent all warrantless government searches of a person's home, but only those that are unreasonable. *Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990). Recognizing the confusion that exists in this circuit in determining the reasonableness of a warrantless search, the Tenth Circuit has noted that "our cases stand for the illuminating proposition that warrantless searches are per se unreasonable, except, of course, when they are not." *United States v. Najar*, 451 F.3d 710, 714 (10th Cir. 2006). Nevertheless, the Supreme Court has made a categorical exception to the warrant requirement when officers believe that a person within is in need of immediate aid. *See, e.g., Mincey v. Arizona*, 437 U.S. 385, 392 (1978).

The "emergency aid exigency" that emerged from *Mincey* was informed by the Court's recognition of important police functions apart from or only tangential to a criminal investigation. *Najar*, 451 F.3d at 714-15. For example, in addition to investigating crime, police officers are also expected to help individuals who are in danger of physical harm and to assist those who cannot care for themselves. *Id.* at 715. The reasonable belief that a child is in need of assistance surely must be counted among the myriad of circumstances that fall within the

29

"exigent circumstances" exception to the warrant requirement. *See Brigham City, Utah v. Stuart*, 547 U.S. 398, 398 (2006) (noting that "[o]ne exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury").

Plaintiffs contend that "the community caretaking exception to the warrant requirement is applicable only in cases involving automobile searches." [Doc. 81, at 19] (citing *United States v. Bute*, 43 F.3d 531, 535 (10th Cir. 1994)). However, the Tenth Circuit has since rebuked its narrow holding in *Bute*, acknowledging that while "some statements in our subsequent cases appear inconsistent with the application of the community caretaking doctrine," the court's earlier application of the doctrine in *United States v. King*, 990 F.2d 1552 (10th Cir. 1993) remains the law of the circuit. *United States v. Garner*, 416 F.3d 1208, 1213 (10th Cir. 2005). Accordingly, officers are "not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *King*, 990 F.2d at 1560.

The facts of the present case are analogous to those in *Najar*, a case involving officers' response to a 911 hang-up call. There, the police dispatcher who received the 911 hang-up call made several attempts to reach the 911 caller, but each time his call was quickly disconnected without a word. *Najar*, 451 F.3d at 713. He dispatched officers to investigate, and upon arriving at the home, the officers knocked and announced their presence. *Id.* Initially, no one responded to the officer's knocks, although a person could be seen and heard within the home. *Id.* The defendant eventually came to the door, denied making the 911 call, and told the officers that no other person was present in the home. *Id.* Concerned for a possible victim inside, officers entered the defendant's home over the defendant's objections. *Id.* The Tenth Circuit determined

that the exigency of the situation justified the officers' entry into the defendant's home. *Id.* at

719-20. In arriving at this conclusion, the Court found that in order for exigent circumstances to

exist in this context, the circumstances must have provided the officers with an objectively

reasonable belief that there was an immediate need to protect the lives or safety of themselves or

others. *Id.* at 718.

Here, upon arriving at the scene, the officers had information that Plaintiff had barricaded

himself in his home, that he was disorderly, and that the original call was in reference to a child

welfare check. Again, law enforcement officers are entitled to rely upon information relayed to

them by other officers so long as their reliance is objectively reasonable. *Oliver*, 209 F.3d at

1190-91. There is nothing to show that such reliance was unreasonable. Further, after the

officers arrived, Officer Apodaca and the 911 dispatcher both instructed Plaintiff to exit his

home, but he did not immediately do so. He could be seen pacing back and forth in his bedroom,

and Officer Taylor advised that he appeared "extremely frantic." Moreover, the 911 dispatcher

reported to the officers, "[h]e's saying if [officers] do fight with him, he will fight back." In the

meantime, the 911 dispatcher relayed to officers that the 911 caller was a retired San Diego

police officer and that, although she didn't see anything, she "heard a female adult yelling at a

small [child] who they have part-time custody of." It was under these circumstances and with

this understanding that officers entered Lundstrom's home to search for other occupants.

Significantly, the potential threat to a child inside of Lundstrom's home was more

explicit than the threat in *Najar*. Here, the 911 caller was a retired police officer who identified

herself and left her phone number and her address with the 911 dispatcher. She told the

dispatcher that she could hear the people at 5100 Mountain beating their toddler and forcing him

to stand in the rain. Lundstrom, of course, denied the presence of a child in his home, just as the

31

defendant in *Najar* denied the presence of any other occupants.  While officers were unable to corroborate the information reported by Mohr, "the business of policemen . . . is *to act*, not to speculate or meditate on whether the report is correct."  *Najar*, 451 F.3d at 714.

In light of Mohr's report that a small child may be in need of assistance at 5100 Mountain, coupled with Lundstrom's refusal to exit his home and his frantic disposition, the Court concludes that it was reasonable for these officers to enter Lundstrom's home in order to search for a child in need of assistance.  Even if Plaintiffs had shown that Defendants violated Lundstrom's Fourth Amendment rights by entering his home without a warrant, Plaintiffs have not shown that such a violation was one of a clearly established right, and *Najar* supports the opposite conclusion. Consequently, Plaintiffs have failed to show the violation of a clearly established constitutional right based on officers' entry into Lundstrom's home.  Defendants are, as a result, entitled to qualified immunity from this claim.

**5.  Officer Taylor's Entry Into the Curtilage**

It is undisputed that at least one officer, Officer Taylor, entered the backyard of Lundstrom's home upon responding to Officer Romero's call for backup.[9]  He remained there until he was notified that Lundstrom had been detained.  Officer Taylor admits that he was close enough to the back of Lundstrom's home to clearly see through Lundstrom's back window.

Plaintiffs' maintain that by entering Lundstrom's backyard, Officer Taylor was within the curtilage, "a location that [was] actually *in* Mr. Lundstrom's house," for constitutional purposes. [Doc. 83, at 18.]  Plaintiffs make various arguments, many of them unsupported by

---

[9] Hibner contends that two officers entered Lundstrom's backyard.  However, because the Court ultimately determines that entry into Lundstrom's backyard was not a Fourth Amendment violation, the number of officers present in the backyard and their identities are immaterial.

evidence, as to why Lundstrom's backyard constitutes curtilage under the factors established by the Court in *United States v. Dunn*, 480 U.S. 294. [Doc. 107, at 9.]  Plaintiffs contend that because Officer Taylor did not have a warrant to enter Lundstrom's home, his presence in Lundstrom's curtilage was a violation of the Fourth Amendment. [Doc. 83, at 18.]

However, because the Court has determined that the officers' entry into the interior of Lundstrom's home was lawful, Plaintiffs' argument concerning entry into the curtilage is essentially moot.  Again, under the circumstances presented, it was reasonable for officers to enter Lundstrom's home in search of a child in need of assistance.  And if entry into the interior of Lundstrom's home was reasonable under the circumstances, so too was Officer Taylor's entrance into the curtilage.  In fact, there was even more justification for Officer Taylor's presence in the curtilage, as Lundstrom had not yet been detained and, as such, was reasonably perceived as a significant threat to officers' safety and to that of a small child.

Plaintiffs have failed to show any Fourth Amendment violation by any Defendant, including Officer Taylor, because of their presence in Lundstrom's curtilage.  Defendants are therefore entitled to qualified immunity in this regard.

### 6. Scope of the Search of Lundstrom's Home

When officers conduct a warrantless search of a person's home, the law requires not only that entry into the home be justified but also that the manner and scope of the search itself is reasonable.  *Najar*, 451 F.3d, at 718.  Plaintiffs maintain that the scope of the officers' search of the interior of Lundstrom's home was not reasonable under the circumstances.

After Lundstrom exited his home, officers entered the interior of Lundstrom's house in search of other occupants.  As noted earlier, there is some dispute about which officers actually entered the interior of Lundstrom's home. While it is undisputed that Officers Apodaca and

Green entered, and that Officers Romero and Taylor did not, a question of fact remains as to whether Officer Sedler entered. However, because neither Officer Romero nor Taylor entered, these officers cannot be said to have personally participated in the search of the interior of Lundstrom's home. *See Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997) ("Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation.") They are, therefore, entitled to qualified immunity based on their undisputed lack of personal participation.

According to Officer Apodaca and Officer Green, they checked every room, including closets and any space that a person could occupy. According to Lundstrom, however, when he returned to his house, his drawers and kitchen cabinets were open, the drawers under his bed were open, and his DVDs and CDs had been pulled out and taken out of alphabetical order. Yet Officer Green maintains that the officers did not open drawers or look through Lundstrom's media.

In *Najar*, the Court determined that the scope of the officers' search was reasonable where "[t]he officers confined the search to only those places inside the home where an emergency would reasonably be associated." *Najar*, 451 F.3d at 720. Here, the emergency justifying the search was the concern for the well-being of a small child reportedly being mistreated. Concern that another occupant might pose a safety risk to the officers may have also served as justification for the search.[10] Thus, the officers could reasonably search only areas in which a small child or another person might occupy. Searching through kitchen drawers and rifling through Lundstrom's media would exceed the scope of a reasonable search premised on

---

[10] While officers have testified as to different reasons for searching the interior of Lundstrom's home, the subjective motivations of the officers, once again, are irrelevant. *Najar*, 451 F.3d at 718.

either a child welfare investigation or the search for other occupants.

Thus, viewing the evidence in the light most favorable to Plaintiffs for purposes of Defendants' motion, the Court concludes that Plaintiffs have shown a violation of a clearly established Fourth Amendment right to be free from a search exceeding its proper scope. *See Najar*. Further, there is sufficient evidence presented by Plaintiffs to create a genuine issue as to whether this search exceeded its proper scope. As such, Defendants Apodaca, Green, and Sedler are *not* entitled to qualified immunity in this regard.

Additionally, viewing the evidence in the light most favorable to Defendants for purposes of Plaintiffs' motion for summary judgment, the Court concludes that a genuine issue of material fact exists with regard to the scope of the officers' search, precluding summary judgment in Plaintiffs' favor. As it stands, the actual scope of the search of the interior of Lundstrom's home is a question best left to the jury's determination.

### 7. Official Capacity Claims

Defendants have not addressed Plaintiffs' constitutional claims against Defendants in their official capacities. However, dismissal of certain underlying Fourth Amendment claims against individual Defendants warrants dismissal of the same claims against the Albuquerque Police Department. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."). On this basis, and given the Court's analysis above, Plaintiffs' Fourth Amendment claims against Defendants in their official capacities shall be dismissed with the exception of Plaintiffs' claim against Officers Apodaca, Green, and Sedler related to the scope of their search of Lundstrom's home.

Further, in order to state a claim against Defendants in their official capacities, Plaintiffs must not only allege facts that would constitute a constitutional violation but also facts indicating that a policy of the entity -- here the Albuquerque Police Department -- was the moving force behind the violation.  *See Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1320 (10th Cir. 1998).  Plaintiffs have failed to allege or present any evidence supporting a claim that any policy of the police department was the moving force behind any violation.  As such, Defendants are entitled to summary judgment with regard to all of Plaintiffs' official capacity claims.

## B.  TORT CLAIMS

In addition to the constitutional claims discussed above, Plaintiffs' Third Amended Complaint alleges that Defendants committed the intentional torts of assault and battery against Lundstrom, trespass against Lundstrom, and false arrest and false imprisonment against both Lundstrom and Hibner. [Doc. 58, at 7-8.]  Defendants' motions seek summary judgment as to each of Plaintiffs' tort claims.[11]

### 1.  <u>Assault and Battery</u>

---

[11] More specifically, Defendants argue that they are entitled to summary judgment on Plaintiffs' tort claims because "immunity has not been waived under the [New Mexico Tort Claims Act]."  [Doc. 73, at 17]; *see also* [Doc. 77, at 17.]  The liability of Defendants for statutory or common law torts is limited by the New Mexico Tort Claims Act (NMTCA), N.M. Stat. Ann. § 41-4-1, *et seq.* (Michie 1978).  Section 41-4-4(A) of the NMTCA grants governmental immunity from liability for any tort to governmental entities and public employees acting within the scope of their duties, except as waived by specific provisions of the NMTCA.  § 41-4-4(A).  Section 41-4-12 of the NMTCA sets forth the specific torts for which immunity has been waived for law enforcement officers.  This section waives immunity for various torts, most of them intentional torts, "caused by law enforcement officers while acting within the scope of their duties."  *Bober v. New Mexico State Fair*, 111 N.M. 644, 653 (1991).  Because it is the law enforcement officer's actions that effect the waiver of immunity, the plaintiff must create a genuine issue of material fact as to the underlying tort to show that the officer waived immunity.  *Sisernos v. City of Albuquerque*, Civ. 02-1035 JB/KBM (D.N.M. Nov. 7, 2003).  It follows that if Plaintiffs' allegations, taken as true, do not amount to the torts alleged, Defendants are immune from suit under the NMTCA.  While the Court acknowledges that Plaintiffs' allegations do not amount to the alleged torts and Defendants may therefore be immune under the NMTCA, it finds the summary judgment standard sufficient to resolve these claims.

Under New Mexico law, battery involves "the unlawful, intentional touching or application of force to the person of another," N.M. Stat. Ann. § 30-3-4 (Michie 1978), and "[a]n assault requires a 'threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery.'" *Romero v. Sanchez*, 119 N.M. 690, 693 (1995) (quoting N.M. Stat. Ann. 30-3-1(B) (Michie 1994)). A common element of battery and assault is an intent "to engage in unlawful conduct that invades the protected interests of the others." *Caillouette v. Hercules, Inc*., 113 N.M. 492, 496-97 (Ct. App. 1992).[12]

Because Defendants conduct in effecting the detention of Lundstrom was not unlawful and Plaintiffs have offered no evidence showing an intent to engage in unlawful conduct, there is no basis for finding Defendants liable for the torts of battery or assault. Moreover, officers are entitled to use such force as is reasonably necessary under all the circumstances of the case. *Mead v. O'Connor*, 344 P.2d 478, 479 (N.M. 1959). And "[o]fficers, within reasonable limits, are the judges of the force necessary to enable them to make arrests or to preserve the peace . . . . When acting in good faith, the courts will afford them the utmost protection." *Id.* at 173.

Plaintiffs have failed to present any evidence supporting their claims of assault and battery. Rather, the evidence establishes that Defendants acted in good faith in employing the force necessary to detain Plaintiffs. Thus, the Court finds, as a matter of law, that no reasonable jury could find for Plaintiffs on their claims of assault and battery. For these reasons, Defendants are entitled to summary judgment on Plaintiffs' assault and battery claims.

## 2. **Trespass**

---

[12] New Mexico does not have uniform civil jury instructions for the torts of assault, battery, trespass, false arrest, or false imprisonment. *See, e.g*., NMUJI 13-1624 cmt. (Michie 2002) (noting committee's conclusion that "there was insufficient New Mexico law on assault and battery to guide the committee on this subject"). Therefore, the Court relies on the published opinions of the State's appellate courts in conducting its analysis of these claims.

A trespass to land "consists of an unauthorized entry upon the land of another" and can form the basis for liability under Section 41-4-12 of the NMTCA. *Montes v. Gallegos*, 812 F. Supp. 1165, 1170 (D.N.M. 1992) (citing *North v. Pub. Serv. Co.*, 94 N.M. 246 (Ct. App. 1980)). In New Mexico, "[c]riminal trespass consists of unlawfully entering or remaining upon posted private property without possessing written permission from the owner or person in control of the land," or "unlawfully entering or remaining upon the unposted lands of another knowing that such consent to enter or remain is denied or withdrawn by the owner or occupant thereof." N.M. Stat. Ann. § 30-14-1(A)-(B) (Michie 1978). A criminal trespasser "shall be liable to the owner, lessee or person in lawful possession for civil damages in an amount equal to double the value of the damage to the property injured or destroyed" by the trespasser. N.M. Stat. Ann. § 30-14-1(D) (Michie 1978).

It follows from the above analysis of Plaintiffs' civil rights claims that Defendants were authorized to enter Lundstrom's house in order to search for a child in need of assistance. *See also State v. Nemeth*, 130 N.M. 261 (2001), *overruled on other grounds by State v. Ryon*, 137 N.M. 174 (2005) (holding that officers may enter a home without a warrant or consent under the community caretaking doctrine when they reasonably believe a person within is in need of immediate assistance); *Ryon*, 137 N.M. at 185 (concluding that officers may enter a home without a warrant or consent under the emergency assistance doctrine, even when they are investigating a crime). Additionally, Plaintiffs have failed to allege that their property was "injured or destroyed." Inasmuch as Plaintiffs' trespass claim is for trespass on land, Defendants are entitled to summary judgment.

The tort of trespass also encompasses the tort of trespass to chattels. *See* Restatement (Second) of Torts § 217 (1965); *Texas-New Mexico Pipeline Co. v. Allstate Constr., Inc.*, 70

38

N.M. 15, 17 (1962) ("Trespass to personalty is the intentional use or interference with a chattel which is in the possession of another, without justification."). A trespasser to chattels is subject to liability if he dispossesses the possessor of the chattel. Restatement (Second) of Torts § 218 (1965).

In this case, Plaintiffs have failed to address any claim of trespass to chattels in their briefs in opposition to Defendants' motions for summary judgment. Nor have Plaintiffs identified any evidence supporting the essential elements of such a claim. Accordingly, Defendants are entitled to summary judgment as to this claim.

### 3. <u>False Arrest and False Imprisonment</u>

Under New Mexico law, "[f]alse imprisonment consists of intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so." *Romero v. Sanchez*, 119 N.M. 690, 693 (1995) (quoting N.M. Stat. Ann. § 30-4-3 (Michie 1994)). Further, under New Mexico law, "a determination of whether [an] officer . . . ma[kes] an illegal de facto arrest, or simply conduct[s] a permissible detention, ultimately depends on whether his actions were reasonable under Fourth Amendment standards." *State v. Werner*, 117 N.M. 315, 317 (N.M. 1994). Good faith and reasonable belief in the lawfulness of police action are defenses to both false arrest and false imprisonment. *Perea v. Stout*, 94 N.M. 595, 600 (Ct. App. 1980); *State v. Johnson*, 122 N.M. 696, 701-02 (1996).

In this case, the evidence submitted by Plaintiffs does not establish all of the required elements of their claims for false arrest or false imprisonment, as the Court has determined that the relevant actions of restraint and confinement were not unlawful. Similarly, the evidence establishes that Defendants had reasonable cause to restrain Plaintiffs for the protection of everyone involved as they attempted to meet their community caretaking responsibilities and to

proceed with the child welfare investigation.  Thus, Defendants are entitled to summary judgement as to these claims.

### IV.  CONCLUSION

For the reasons stated above, **IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment Requesting Dismissal of Plaintiff Joseph Lundstrom's Claims is hereby **GRANTED IN PART** and **DENIED IN PART** as more fully described herein, that Defendant's Motion for Summary Judgment Requesting Dismissal of Jane Hibner's Claims is hereby **GRANTED**, and that Plaintiffs' Motion for Summary Judgment is hereby **DENIED**.

Dated this 11th day of September 2008.

_____
UNITED STATES DISTRICT JUDGE